EULOGIO DIMAS RIERA ET AL., Plaintiffs and Appellees, *v.* BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO ET AL., Defendants and Appellants.

Nos. 4795 and 5038.   Argued April 15, 1930.—Decided July 8, 1931.

*C. Coll Cuchí, J. de Guzmán Benítez,* and *J. Sifre, Jr.,* for appellants.   *Pellón & Ayuso* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

These two appeals have been prosecuted separately, but they will be considered in a single opinion. They were taken in the same case; the first against the final judgment and the second against an order denying a new trial. The hearings of both appeals were held on the same day.

At the time of the filing of the complaint, November 23, 1926, all seven plaintiffs were minors; two of them, Eulogio and Josefina, had become emancipated. The other five ap-

peared represented by their mother with patria potestas, Josefina Bengoechea Macías. The father, José Dimas Riera Cifuentes, had died in an automobile accident on May 6, 1920, and the plaintiffs were declared his intestate heirs.

The defendants are the Banco Territorial y Agrícola de Puerto Rico, a banking institution of this Island, having a branch in the Republic of Santo Domingo, and Olegario Riera Cifeuntes, a Spanish citizen residing in the Peninsula.

The action brought is entitled for the recovery of property and for damages, and is based, in short, on the following allegations.

(3) That in the partition of the estate of José Dimas Riera Cifuentes, the plaintiffs were allotted a credit amounting to $106,681.42 against Central Boca Chica, of Santo Domingo, in mortgage bonds of the same Central, and there were issued and delivered to said plaintiffs, through their representative, 400 bonds having a par value of $500 each.

(4) That as the plaintiffs were minors and there was a conflict of interests between the mother and her children, defendant Olegario Riera Cifuentes acted as next friend (*defensor*) of such minors in the said partition and had full knowledge af the allotment made, including those mentioned in the preceding paragraph.

(5) That defendant Olegario Riera, who on September 11, 1920, and thereafter, was treasurer of the Central Boca Chica, acting in agreement and in combination with the other defendant, Banco Territorial, at that time a creditor of Boca Chica, asked the representative of the plaintiffs for the return of the 400 bonds under the pretext of exchanging them for others of a new issue, and with the only purpose, which was not made known to the plaintiffs nor to their representative, of using them as security for the debt of the Central with the Santo Domingo branch of that Bank, in which debt the plaintiffs had no interest or responsibility.

(6) That by virtue of this combination between the defendants, the representative of the plaintiffs delivered to the

Bank, on September 11, 1920, the bonds belonging to the plaintiffs, for the purpose and with the belief that they would be exchanged for others; that the Bank received them and sent them to its agency in Santo Domingo, and there the defendants, acting in concert, disposed of the bonds without the consent of the plaintiffs or of their legal representative, and without any judicial authorization therefor. That the defendant bank appropriated the bonds, although the plaintiffs never sold them to that institution nor consented to any transaction involving them; and that the defendants have refused the demands of the plaintiffs, who thus find themselves deprived of their said property.

(7) That, according to plaintiffs' information and belief, the bonds were delivered by Olegario Riera as collateral security for a debt of the Central Boca Chica with the Bank, without the plaintiffs ever authorizing said delivery nor becoming sureties of Olegario Riera or of the Central Boca Chica to the said Banco Territorial y Agrícola de Puerto Rico.

The complaint concludes by praying that the defendants be jointly and severally (*solidariamente*) adjudged to return to the plaintiffs the 400 bonds of $500 each or, if such return can not be made, to pay to the plaintiffs the value thereof, with legal interest thereon and costs. The defendants filed separate demurrers which were overruled and then answered, in brief, as follows:

The Bank denied the allegations contained in paragraphs 3, 4, 5, 6, and 7 of the complaint, and on the contrary alleged that the representative of the plaintiffs, spontaneously and without any request on its part, had delivered a certain number of bonds of the Central Boca Chica to be forwarded to said Central through the bank's agency in Santo Domingo; and that it did so.

Riera admitted of paragraph 3 only the allegation that in the partition the plaintiffs had been allotted a credit amounting to $106,681.42 gainst Central Boca Chica, and denied the rest; he admitted that portion of paragraph 4 wherein it is

averred that this defendant represented the minors in the partition as their next friend and denied the rest, especially in regard to the allotment of the bonds of the Central to the minors; and he denied paragraphs 5, 6, and 7.

The case went to trial. The plaintiffs introduced as documentary evidence certain marriage, birth, and death certificates; a declaration of heirship; a certificate of protocolization of the proceedings for the partition of the estate of José D. Riera Cifuentes in regard to the following two particulars:

"Inventory: No. 41. One hundred six thousand six hundred and eighty-one dollars and forty-two cents against Central Boca Chica of Santo Domingo; in mortgage bonds secured by all the real property and fixture therein belonging to said entity, Central Boca Chica, domiciled in Andrés Común de Guerra, Province of Santo Domingo, D. R. . . . $106,681.42.

"Allotment: The credit of one hundred six thousand six hundred and eighty-one dollars and forty-two cents against the Central Boca Chica, of Santo Domingo, represented by mortgage bonds of the said company, referred to in item No. 41 of the inventory, in the amount of . . . $106,681.42";

a receipt reciting thus:

"BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO.—We have received from the Heirs of José D. Riera the sum of 400 bonds of $500 of the Cent. Boca Chica to be forwarded to our Agency in Santo Domingo as a part of the collateral security for the agricultural loan with said agency. San Juan, Puerto Rico, Sept. 11, 1920. (Sgd.) A. Frasqueri, Cashier";

letters from the defendant Olegario Riera to his brother, the ancestor of the plaintiffs; a draft drawn by the Central Boca Chica to the order of the Banco Territorial on José D. Riera, accepted and paid by the latter on March 9, 1920; a certificate as to the legal proceedings, taken in Santo Domingo for the sale on execution of the Central Boca Chica, and copies of several resolutions adopted by the Council of Administration of the Banco Territorial: One dated July 12, 1919,

with the presence of Councillor José D. Riera, taking under advisement, for decision at the next meeting, a verbal application of the Central Boca Chica for an agricultural loan in the amount of $100,000; another of July 14, 1919, also in the presence of Councillor Riera, approving an agricultural loan for $200,000 to the Central Boca Chica, secured by . . . mortgage bonds of the same Central in the amount of $250,000; another of September 4, 1919, with the concurrence of Councillor Riera, ratifying the agreement of July 14th, dispensing with the security of the sugar cane, and reducing the security of the bonds to $200,000; another of October 9, 1920, after the death of Councillor Riera, authorizing the agency in Santo Domingo, to execute with the Central Boca Chica an agricultural loan contract for $250,000, secured by the borrower's own mortgage bonds taken at par value; and another of August 30, 1920, item numbered 6 of which recites as follows:

"6. Answer the letter of the 23rd of this month from Santo Domingo Agency, in the sense of acceding to the request of the Central Boca Chica for an increase 'to the amount of $250,000' of the loan which had been granted to it at the meeting of the Council held on the 9th of the present month, 'on condition that it shall give as security $300,000 or more' of its own mortgage bonds."

The plaintiffs introduced the testimony of Alberto Frasqueri, Antonio Macías, and Primitivo Rocafort. Frasqueri, cashier of the Bank, identified the receipt above mentioned and stated that the bonds were delivered to him by a person, whose identity he does not remember, in the name of the Heirs of Riera, to be forwarded to the Agency in Santo Domingo; and Rocafort, secretary of the Bank, attested to the certificate to which we have already referred. Macías was the principal witness. His testimony covers from page 9 to 59 of the first part of the record of case No. 4795.

We have carefully read and analyzed every line of this testimony. We shall attempt to summarize it as completely as possible.

The witness knows the plaintiffs. They are his nephews. He is 41 years of age and since he was 21 he had been working for José D. Riera, "and in all his business dealings the witness participated, . . . although he did not have a written power of attorney, but a verbal one, he was the one who did everything." He was in Colombia on business for Riera when the latter died. He was called back by his sister and by Fabián to take charge of Riera's office. His sister gave him a power-of-attorney. "When I arrived from Colombia, Mr. Rafael Fabián asked my sister for the keys to the office in order to make note of the documents which were there, and they took Eulogio Riera, who was then 13 or 14 years old, to the office, and also Honorato Andrés and Tomás Lamela; they took an inventory of all papers of Mr. Riera and among them they listed: bonds of the Central Boca Chica of Santo Domingo; and then I proceeded to make an inventory and I found in the safe the mortgage bonds of the Central Boca Chica . . . four hundred bonds . . . having a par value of $500 each." He knew that Riera had those bonds "because the Central Boca Chica had given them to him on a mortgage which was executed in his favor."

He knew that the Banco Territorial had no concern with those bonds. The heirs had no business dealings whatever with the Bank. The witness has kept the papers of the Succession since the death of Riera. The bonds had no indication of being pledged. Olegario Riera had participated in the testamentary proceedings as next friend of the minors. "In the partition, the bonds were allotted to the minors as security."

The bonds found their way into the hands of the Banco Territorial. When he was asked: How did that happen?, and when he referred to a certain letter which, according to the witness, defendant Olegario Riera had written to him, the defendants objected to his testifying as to the contents of such letter. He answered that he did not have the letter in his possession, as he had sent it to Honorato Andrés in

540

Spain by reason of a suit against Riera there and it had not been returned to him. He continued testifying that, "in the month of September, 1920, Mr. Olegario Riera. was in San Juan and he repeated to me what he had said in his letter." At this stage, the judge intervened and the witness then continued answering the interrogatory, thus:

"Judge: You say you received a letter from Olegario Riera?

"A. Yes, sir.

"Judge: In view of that letter, did you or did you not do something? Did you do what the letter said or not?

"A. No, because that was more . . .

"Q. Do you mean to say that you received the letter in which you were given certain instructions, but you did not carry them out?

"A. They had not been carried out yet, and in September, 1920, Olegario Riera came, towards the end of August or the first part of September, when he was here in San Juan . . .

"Q. What happened with him?

"A. He told me that at some opportunity I should deliver to Mr. Mutiu or to the Banco Territorial y Agrícola the bonds I had, as they were going to be exchanged for others because they had already matured.

"Q. Who did you say?

"A. Mutiu, who was the captain of the S. S. 'Santo Domingo.' He was a person who enjoyed the confidence of the Central and at the same time he was one of the planters (colonos).

"Q. But what did Riera say to you personally?

"A. That I should deliver the bonds.

"Q. To whom?

"A. To the Banco Territorial y Agrícola or to any other trusted person because they were going to be replaced by others of a new issue, as those bonds had matured and could be foreclosed at any time.

"Q. What did you do?

"A. Then, on September 11, I personally delivered to Mr. Frasqueri the said four hundred bonds.

"Q. The 11th of September of what year?

"A. 1920, personally to Mr. Frasqueri.

"Q. Was any document given to you?

"A. I demanded a receipt and he gave me one, in which he

stated that it was for the purpose of sending them to their agency or branch in Santo Domingo as security.

"Defendant: There is a receipt already presented.

"Judge: Do not tell the contents of the receipt."

He identified the receipt which had been introduced in evidence.

The interrogation of the witness continued for the purpose of presenting the letters from Olegario Riera to José D. Riera, the first one, dated May 6, 1919, "as to a paragraph thereof which says: 'The mortgage deed has not been prepared as yet because we are waiting for you to see the minutes, and to get your consent as well as that of Mr. Rafael Fabián to appear as lenders to the company. Then it will be recited that the loan has already been agreed upon, subject to the conditions stated in the minutes. The draft of the mortgage bond had already been completed, and instead of the maturities being annually on September 1st, as you said, we have decided that the first instalment amounting to $70,000 should mature on July 1, 1920, and the rest on the same day of the subsequent years. Thus the coupon representing the interest will mature quarterly on September 30th, December 31st, March 31st, and June 30th. On the other hand, any transaction may be made earlier' '"; the second, dated August 14, 1919, as regards the suggestion contained in the last paragraph thereof "that the bonds are being prepared"; and the third, dated November 13, 1920, "to prove that on that date Olegario Riera was acting as Treasurer of the Central Boca Chica." The letters were admitted in evidence over the objection of the defendants, who took exception thereto.

The witness identified another letter from Olegario Riera addressed to the Heirs of Riera which was offered in evidence also to show that Olegario was the Treasurer of the Central, and a draft for $25,000 drawn by the Central on Riera to the order of the Bank. These documents were ad-

mitted also against the objection and exception noted by the defendants.

The witness went on to testify that for the delivery of the bonds no judicial authorization had been asked; · that neither the bonds nor their equivalent value had been returned; and he added: "I understand that, with them, the Banco Territorial y Agrícola foreclosed on the Central Boca Chica of Santo Domingo." He identified the copy of the foreclosure proceeding which was offered and admitted in evidence against defendants' objection and exception.

He has acted as attorney in fact and manager of the Succession, ever since Riera died, and he is sure that no judicial authorization for the delivery of the bonds had been sought. · At this point, the direct examination ended. The witness continued answering the questions put to him by the defendants.

He confirmed his previous statement that he had worked with Riera for twenty years. He testified that Riera was for a time Vice President of the Central Boca Chica and afterward loaned money to the Central; that he did not remember whether Riera served as president of the Central, nor whether at the time of his death he held any position in the Board of Directors of the Central. "He was saturated with the business, but not with the offices."

To the question: How did Riera acquire those 400 bonds?, he answered: "They were his." The cross-examination then continued, textually as follows:

"Q. How did he acquire them? What deal did he make?

"A. I do not know what deal he made with the Central; the Central gave them to him as security for the money which he had loaned to it.

· "Q. But the transaction that gave rise to all this?

"A. As I said, I do not know what transaction he made with the Central.

"Q. But as you have said that you were well acquainted with the business of José D. Riera, it seems to me that I was perfectly justified in asking you about the matter.

"A. Well, but you take, for example, that draft for $25,000 that was paid by Riera. What security did he have to have, when he paid such large amounts?

"Q. What do you mean by that?

"A. That he paid for the account of the Central, and the Central had to secure him with those bonds.

"Q. Then you bring that example as proof that Riera had those bonds?

"A. I could give many examples, and if the court would let me explain, I would explain frankly.

"Q. What I would like to know is as to the ownership title held by Mr. Riera.

"A. I could not go that far. You would have to ask him.

"Q. Then you do not know how he acquired the bonds?

"A. What I do know is that the bonds were his.

"Q. Why?

"A. Because proof has been made that after Riera's death the bonds were allotted to the minors.

"Q. I refer to the knowledge that you say you have about the business of Dimas Riera?

"A. I do not know, as he went to Santo Domingo and acquired the bonds. The fact is that they were given to him as security.

"Q. You say they were given to him as security?

"A. Those bonds belonged to Riera; the Central gave them to him; they gave them to him as a mortgage security in his favor.

"Q. Why did they give them to him as security? Were they not his?

"Plaintiff: That is a question that the court has to decide and not the witness. In the first place the receipt itself admits it. It says—bonds of the Heirs of Riera—and now they are attempting to deny that what they received did not belong to those heirs; they are estopped by their own conduct to deny that.

"Defendant: Don't you believe, Mr. Macías, that Mr. Riera had those bonds in his capacity as President of the Central Boca Chica at that time?

"A. I do not believe so.

"Q. Why?

"A. Because he was the only one who loaned money to the Central and he held them as security.

"Q. Was Riera the only creditor of the Central?

"A. The Central may have had others, but he was the only one who paid out the money here.

"Q. I do not understand that. Mr. Riera was the only one who paid out here?

"A. The only one who loaned money to the Central.

"Q. The only creditor, then?

"A. There may have been others there, in Santo Domingo.

"Q. You mean to say that he alone loaned money to the Central?

"A. Of course Mr. Riera paid; for example, that draft for $25,000.

"Q. And Mr. Fabián, didn't he loan money to the Central?

"A. No, sir.

"Q. And Mr. McCormick?

"A. Nor Mr. McCormick. The only thing he did was to take up 50 bonds that remained in the Banco Comercial, so as not to embarrass it.

"Q. But that has no connection. The question is whether you know why Mr. Dimas Riera was the owner of those bonds.

"A. I repeat again that I do not know. That they were in his possession."

The witness continued testifying in reference to his participation in the partition of the estate of José D. Riera. The interrogatory finally developed as follows:

"Defendant: (Q) Do you remember the total amount allotted in that partition as a charge against the Central Boca Chica?

"A. It amounts to $106,000 and some cents.

"Q. $106,681.42?

"A. I think so.

"Q. Do you mean that that was a debt which the Central Boca Chica owed to Mr. José D. Riera?

"A. Yes, sir.

"Q. Was that debt secured by any property, was it a personal obligation or did it not have security?

"A. The debt was those mortgage bonds.

"Judge: What did you say?

"A. The debt was the mortgage bonds.

"Q. And is that the reason why you say that the bonds belonged to Don Pepe Riera?

"A. That the bonds were the property of the minors.

"Q. The one hundred six thousand and odd dollars that Boca Chica owed to José D. Riera, was that in money?

"A. I do not know whether it was in money; in bonds, there they are.

"Judge: What did you say?

"Defendant: (Q.) The one hundred six thousand and odd dollars that Boca Chica owed to José D. Riera, was that in money?

"A. I can not say whether it was in money, because as the Central often drew on Don José D. Riera for $25,000, $50,000, or $100,000, it gave those bonds as security.

"Q. When were those bonds given to him as security?

"A. They were not given to the minors, they were given to José D. Riera. It was after the death of Riera that I spoke of the minors.

"Q. And it is $106,000?

"A. That's what remained for the partition of the estate.

"Q. But if it is $106,000, how can it be $200,000?

"Judge: He has already stated that their nominal value can not be considered as their actual value; a $5,000-bond may on certain occasions be only worth $5.

"Q. But you have stated that he acquired those bonds as security.

"A. I was referring to the partition of the estate.

"Judge: The witness has said it before; he has been asked several times as to what was the origin of the acquisition by José D. Riera of those bonds, and he has stated that he does not know.

"Defendant: But later he has said that they were given to him as security.

"Defendant: (Q) How did José D. Riera acquire those bonds?

"A. I again repeat that I do not know.

"Q. If you do not know how he acquired them, how can you assert that they were his?

"A. They belonged to Mr. José D. Riera because when he died, besides having done business previously, as the drafts show, there are letters here introduced in evidence, which refer to those bonds. I presume that they belonged to Mr. Riera, as Mr. Lamela and Mr. Olegario Riera opened the safe and took note of everything in it without awaiting my arrival from Colombia.

"Q. Are those the reasons?

"A. And because they were in his desk and because they were described in the partition of the estate by Honorato Andrés himself.

"Judge: Those are the reasons you have for saying that the bonds belonged to José D. Riera?

"A. Yes, sir."

Then follows a large number of questions on cross-examination in reference to the delay in making claim, this part of the interrogatory concluding thus:

"Q. And why did you allow more than two years to elapse, since the bonds were delivered in September, 1920?

"A. Because, I repeat again, in 1921 Mr. Olegario Riera ceased to be Treasurer of Boca Chica.

"Q. And why did you not ask Boca Chica for them? You, on behalf of the minors?

"A. But the Banco Territorial had them to foreclose.

"Q. Where? In what place were the bonds?

"A. I do not know, because I delivered them to Mr. Frasqueri.

"Judge: Did you deliver them in San Juan or in Santo Domingo?

"A. In San Juan.

"Defendant: (Q.) Then, if you delivered those bonds on September 11, to the Banco Territorial y Agrícola, and you were given this receipt, which we have here, issued in favor of the Heirs of José D. Riera, if this was in order to make an exchange for other bonds, how is it that you accepted a receipt from the Banco Territorial which recited: 'To be forwarded to our Agency in Santo Domingo, as part of the collateral security for the agricultural loan of said agency'?

"A. I knew nothing of any loan that it might have.

"Judge: The question is whether you made any objection to that receipt by reason of its wording.

"A. No, sir, because at that time I had confidence in the Banco Territorial, and as Olegario Riera had told me that it was for the purpose of replacing them by others, I had no hesitancy either in delivering them to the Bank without any requirements.

"Q. And why did you demand that the receipt should recite: 'Bonds belonging to the minor children of José D. Riera to be exchanged for others'?

"Plaintiff: That is immaterial, because any explanation given by the Bank could not bind the minors.

"Judge: The Court admits it. The specific question is, why did you make no objection to that receipt?

"A. I already answered counsel, because I had confidence in the Bank and because Olegario Riera had asked them from me in order to have them exchanged for others."

The defendants then directed their cross-examination to the question of whether the credit of $106,000 against the Central had been paid or not, and the following occurred:

"Q. That credit of one hundred six thousand and odd dollars which the Heirs of Riera held, has any part of it been paid?

"Plaintiff: Let us see, sir; is the Central Boca Chica, against which that credit is held, participating in this proceeding, or who is it? In the first place, in the direct examination no question was asked with reference to that; in the second place, the Central Boca Chica is not a party to this action; we are not concerned here with the accounts of the Central Boca Chica.

"Judge.: Let the witness answer.

"A. After the death of Riera, the Central Boca Chica continued drawing on the Heirs of Riera for funds and the money was paid, so if we were going into that we would have to add to the credit of $106,000 many other sums which it drew.

"Q. What amount did it draw?

"A. I cannot say.

"Q. Did it draw $50,000?

"A. I cannot say. I have letters here referring to ninety thousand dollars.

"Q. For what purpose?

"A. To pay its accounts.

"Q. But did the Central Boca Chica continue drawing money?

"A. Boca Chica; Olegario Riera, Treasurer. If we are to stretch the claim to that point, I would have to bring in all the drafts subsequent to Riera's death.

"Q. With what funds were those drafts paid?

"A. With funds belonging to Riera's widow.

"Q. Not money of the minors?

"A. I do not know; the estate had already been partitioned, and I paid.

"Q. Did you pay as attorney-in-fact of Riera's widow?

"A. The account in the National City Bank is still in the name of the 'Heirs of José D. Riera.'

"Q. Do you mean that the Heirs of José D. Riera continued paying?

"A. Yes, but it was not the heirs.

"Q. And if the Central Boca Chica had no funds on deposit, why did you pay those drafts?

"A. Because, as I said before, we were stockholders and we had

**548**

been the ones, who always loaned it money. I mean, José D. Riera. Here are letters from the president, where he says 'that he expects at any moment to make sugar sales in order to pay.'

"Q. What is the date of that letter?

"A. August, 1921, Miguel Guerra Parra, President of the Central Boca Chica.

"Q. Until what date did you continue paying?

"A. I do not remember either.

"Q. About what date? Was it in 1921?

"A. Yes, when they dismissed Olegario Riera.

"Q. So that until 1921 you continued paying drafts from Boca Chica?

"A. I do not know whether it was until 1921.

"Q. But tell me until what date.

"A. I can not tell you.

"Q. Was it until December, 1920?

"A. Well, we are not here concerned with the account of the Central Boca Chica.

"Q. Was it in December, 1920?

"A. I do not remember.

"Q. How is it that with the credit of one hundred six thousand and odd dollars outstanding, how is it that you continued paying money to Boca Chica?

"A. Not paying . . .

"Q. Did you not continue paying money?

"A. Because we were stockholders.

"Q. Were the stockholders bound to pay because of the fact that they were stockholders?

"A. Because as we had the bonds, we did not believe that they would fail us.

"Q. Did you continue paying with funds belonging to the estate?

"A. Belonging to my sister.

"Q. But the account in the Bank, was it in the name of Heirs of José D. Riera?

"A. Yes, but that does not mean . . ."

At the close of plaintiffs' evidence, the defendants applied for leave to introduce the testimony of Olegario Riera and Honorato Andrés, but as this involved a continuance of the trial, since said witnesses resided in Spain, and both

parties had announced at the beginning of the trial that they were ready to proceed, the court refused such application and declared the case closed and ready for judgment, which it rendered on June 27, 1928, adjudging the defendants jointly and severally to return to the plaintiffs the 400 bonds involved in the case or, if such return should not be possible, to pay to them the sum of $200,000 as the value of the bonds, together with legal interest thereon from the filing of the complaint, and costs including attorney's fees.

The district court based its judgment on a statement of the case and opinion which contains the following findings:

"That in the proceedings for the liquidation, partition, and allotment of the estate of José Dimas Riera Cifuentes, which partition, after being judicially approved, was protocolized on August 3, 1920, before notary José Ramírez Santibañez, the plaintiffs were allotted in equal parts, jointly and undivided, a credit amounting to $106,681.42, against the Central Boca Chica, of Santo Domingo, in mortgage bonds secured by all the property and fixtures appurtenant thereto belonging to said Central Boca Chica, domiciled in Andrés Común de Guerra, D. R.; and accordingly, pursuant to said allotment, the plaintiffs were given 400 mortgage bonds issued by said Central Boca Chica having a par value of $500 each, and said bonds were received by the representative of the plaintiffs and were in the possession of their owners, that is to say, of the said plaintiffs.

"It has been proved by the same deed of partition of the estate above mentioned (Plaintiffs' 'Exhibit L') that in the said proceedings for appraising, liquidating, and distributing the property comprising the estate of Mr. José Dimas Riera Cifuentes, as all the plaintiffs herein were under age and had interests in conflict with their mother, they were represented by the defendant herein, Olegario Riera Cifuentes, as next friend appointed by this District Court and who signed before a notary said partition of the estate as such next friend of the minors, and therefore had full and precise knowledge of the allotments made to the plaintiffs in said partition, including the knowledge that the minors, now plaintiffs, had been allotted in such partition the bonds above mentioned. So that the fact has been proved beyond all doubt that defendant Olegario Riera y Cifuentes knew that said bonds payable to bearer claimed in the complaint herein, belonged solely and exclusively to the minors, the present plaintiffs, and to no one else.

"It appears from the certificate issued by the Clerk of the Civil and Commercial Department of the Court of First Instance of the Judicial District of Santo Domingo, D. R., marked plaintiffs' 'Exhibit S', that there was had before that tribunal a proceeding for the sale on execution of the sugar mill designated as 'Central Boca Chica', together with all its fixtures and dependencies, which proceeding was instituted and prosecuted at the instance of the Banco Territorial y Agrícola de Puerto Rico.

"In the book containing the terms and conditions fixed for the auction, and which are copied in the above mentioned certificate, the following is set forth under the caption 'Preliminary Statements': " 'By virtue of the mortgage obligation contracted by Central Boca Chica, a corporation (*compañía anónima*) or stock company domiciled in Andrés Común de Guerra, Province of Santo Domingo, under a deed attested by notary public Armando Pellerano Castro, on September 9, 1919, duly registered and recorded in the Registry of Mortgages, and executed in favor of the Banco Territorial y Agrícola de Puerto Rico, a banking corporation located in the city of Santo Domingo, D. R., to secure the payment of the bonds payable to bearer issued by the Central Boca Chica Company on September 1, 1919, under Nos. 1 to 700, of the value of $500 gold each, and subscribed by Mr. Miguel Parra Alba, Vice-President, and Mr. Olegario Riera, Treasurer of the corporation (*compañía anónima*) Central Boca Chica, etc.'

"In the same certificate ('Exhibit L') there appears the following: That said foreclosure took place at the instance of the Banco Territorial y Agrícola de Puerto Rico, acting by itself as holder of 600 of the said bonds, and as trustee, as regards the bonds numbered 600 to 700, that is, the remaining 100 bonds, the total value of the bonds being $407,488.47, United States gold, the amount of the principal and interest due.

"From the same certificate ('Exhibit L') it appears that at the auction the award was made, for the sum of TWO HUNDRED FIFTY THOUSAND AND TEN DOLLARS, United States gold, in favor of Andrés Sugar Co., a stock company; and that by virtue of such award the purchaser at the foreclosure sale took possession of the sugar mill designated as 'Central Boca Chica,' together with all its installations, boiler-house machinery railroad and telephone lines, house for residence and offices, fixtures and dependencies, and everything useful for carrying on the business of said Central. (Proved facts.)

"From the testimony of Antonio B. Macías, the following appears:

"That Antonio B. Macías had been working with his brother-in-law, José Dimas Riera, for about 14 years, and that he participated in all the business of Riera until the latter's death, which occurred on May 6, 1920; that after the death of José Dimas Riera, his widow executed a power of attorney in favor of the witness; that defendant Olegario Riera was a brother of decedent José Dimas Riera; that Rafael Fabián asked said widow for the keys to the office of her deceased husband; that they found in said office 400 mortgage bonds issued by the Central Boca Chica, of Santo Domingo, having a par value of FIVE HUNDRED DOLLARS each; that the witness had previously seen those bonds in the possession of José Dimas Riera; that said bonds had nothing to do with the Banco Territorial y Agrícola de Puerto Rico, nor showed any indication of being pledged; that defendant Olegario Riera, by means of a letter, gave the witness certain instructions and that, afterwards, Olegario Riera personally told the witness 'that he should deliver the bonds to the Banco Territorial y Agrícola de Puerto Rico in order to replace them by another issue; that at that time the Heirs of Riera had no loan transaction pending with the Banco Territorial y Agrícola; that on September 11, 1920, the witness, Antonio B. Macías, delivered personally to Mr. Frasqueri (Treasurer of the Banco Territorial y Agrícola de Puerto Rico) the said bonds and was given a receipt (Plaintiffs' 'Exhibit M'), which literally copied reads as follows:

" 'No. 8675.—For $_____. BANCO TERRITORIAL Y AGRÍCOLA DE PUERTO RICO.—We have received from the Heirs of José D. Riera the sum of 400 bonds of $500 of the Cent. Boca Chica to be forwarded to our Agency in Santo Domingo as a part of the collateral security for the agricultural loan with said agency. San Juan, Puerto Rico, Sept. 11, 1920. (Sgd.) A. Frasqueri, Cashier.'

"Witness Macías further testified that no judicial authorization for the delivery of those bonds had been sought. That neither said bonds, nor the substitute bonds, nor the value thereof had been returned to the Succession; and that the Banco Territorial y Agrícola de Puerto Rico, with those bonds, foreclosed on the Central Boca Chica, of Santo Domingo. (Proved facts.)

"From the certificate regarding the resolutions adopted by the Council of Administration of the Banco Territorial y Agrícola de Puerto Rico introduced in evidence (Plaintiffs' 'Exhibit T'), it does

not appear in any way that there had been any transaction of any kind between the Banco Territorial y Agrícola and the Heirs of José Dimas Riera, whereby said heirs bound themselves to deliver said mortgage bonds as security for any agricultural transaction; nor any loan whatsoever. However, it has been shown that the Banco Territorial y Agrícola de Puerto Rico received the 400 bonds belonging to the Heirs of José Dimas Riera and that said Bank, as holder of the above mentioned bonds, brought foreclosure proceedings in the courts of Santo Domingo against the Central Boca Chica, using said bonds for its own benefit.

"It has been proved that the Banco Territorial y Agrícola disposed of the said 400 bonds without the consent or acquiescence of the plaintiffs or of their legal representative (for it has not been shown in any way that Antonio B. Macías was the legal representative of the said minor plaintiffs), and such disposal took place without any judicial authorization or order from a competent court.

"It has been proved that the 400 bonds were bonds payable to bearer, and the act of disposing of bonds payable to bearer and delivering them to another person is practically equivalent to an alienation of such bonds.

"The only person who could have lawfully delivered the bonds to the Banco Territorial y Agrícola de Puerto Rico was Doña Josefa Bengoechea y Macías, who was the mother of said minors with patria potestas over them at that time (Spet. 11, 1920); but in order to legally dispose of said bonds and deliver them to the Banco Territorial y Agrícola de Puerto Rico, personally or through her attorney in fact, Antonio B. Macías, it would have been absolutely indispensable for her to obtain the proper judicial authorization from a competent district court, after showing the necessity and utility of the alienation, in accordance with the explicit provisions of section 229 of the Civil Code.

"The defendant Banco Territorial y Agrícola de Puerto Rico could not have been unaware that Mr. José Dimas Riera Cifuentes had died prior to the receipt by the Bank of the 400 bonds payable to bearer. We say that it could not have been unaware of this fact, because the death of José Dimas Riera was caused by an automobile accident in the Island of Puerto Rico; and especially because it appears from the certificate regarding the resolutions of the Council of Administration of the Banco Territorial y Agrícola de Puerto Rico (Plaintiffs' 'Exhibit T'), that José Dimas Riera was one of the councillors of said Bank, and in his capacity as such councillor he

attended the meetings at the Bank, as appears from the minutes of the meetings held by said Council of Administration on July 12, 1919, July 14, 1919, and September 24, 1919.

"In the meetings of the Council of Administration of the defendant bank, held on August 9 and August 30, 1920, the minutes of which we have before us, the absence of Councillor José Dimas Riera is noted, as he had died prior to these dates.

"It has been proved, beyond doubt, that the said 400 mortgage-bonds payable to bearer, of the Central Boca Chica, passed from the hands of plaintiffs into the possession of the Banco Territorial y Agrícola de Puerto Rico; that said Bank appropriated them to itself without any alienation thereof, by the plaintiffs in favor of the said Banco Territorial y Agrícola de Puerto Rico, ever having taken place; that the Bank used said bonds for its own benefit in order to enforce them against the Central Boca Chica of Santo Domingo; and that said bonds have not been returned to the plaintiffs by either the Banco Territorial y Agrícola de Puerto Rico or the other defendant, Olegario Riera Cifuentes, the plaintiffs thus having been deprived of the said mortgage bonds.

"It has not been shown in any way that the plaintiffs had authorized the delivery of said bonds as collateral security for any debt owing from the Central Boca Chica to the Banco Territorial y Agrícola de Puerto Rico, or to secure debts not connected with said minors; nor that the plaintiffs ever became sureties of the defendant Olegario Riera Cifuentes or of the Central Boca Chica in favor of the said Banco Territorial y Agrícola de Puerto Rico.

"It has been proved that none of the defendants has returned to the plaintiffs the 400 bonds payable to bearer which were delivered to the Banco Territorial y Agrícola de Puerto Rico.

"It has been proved that no bonds in substitution of the 400 bonds handed to the Banco Territorial have been delivered by either of the defendants to the minors; and likewise that the latter have not received from any of the defendants the amount of said bonds, valued at $500 each.

"It has been proved that the defendant Olegario Riera Cifuentes was, on September 11, 1920, and subsequent thereto, Treasurer of the Central Boca Chica."

On July 26, 1928, the defendants appealed from the judgment rendered on June 27 of the same year. Previously, on July 9, they had filed a notice of their intention to apply

for a new trial, and the motions therefor were filed on the 27th of the following August.

The motions for a new trial are based on the following grounds: 1. Accident or surprise, which ordinary prudence could not have guarded against; 2, newly-discovered evidence; 3, insufficiency of the evidence to support the judgment; and 4, errors committed in the introduction of the evidence.

We have already referred to the request made by the defendants, at the close of plaintiffs' evidence, for leave to introduce the testimony of Olegario Riera and Honorato Andrés; and to the refusal thereof by the trial court. It is urged in the motion for a new trial, supported by affidavits, that the defendants relied on the receipt which the Bank gave when receiving the bonds, and that the statements of the witness, Macías, at variance with the recitals of the receipt, constituted a surprise which the defendants could not possibly have foreseen.

With respect to the newly-discovered evidence, the motions for a new trial are explicit. We shall take one of them as a basis, both being practically identical. It quotes from the complaint, and then says:

"Therefore, the essential allegation set forth to support the cause of action of the plaintiffs is their being the owners of the 400 bonds of the Central Boca Chica, their ownership title consisting in the allotment of a credit, amounting to $106,681.42, which the plaintiffs owned at the time the deed of partition of the estate of their ancestor, José D. Riera, was executed.

"The incongruity of this allegation was duly pointed out in the demurrers filed by the defendants.

"Now, notwithstanding the diligence and efforts of the defendants, it was not possible for them to procure before the trial sufficient evidence as to the following facts, of the existence of which the defendants were unaware previous to the trial:

"(1) That the credit allotted to the plaintiffs in the deed of partition and distribution of the estate of José Dimas Riera, as a debt owing from the Central Boca Chica to José D. Riera, was paid

by said Central after the death of Riera and before the filing of the complaint by the plaintiffs.

"(2) That the plaintiffs never considered as belonging to them the mortgage-bonds referred to in the complaint, inasmuch as even after the supposed allotment was made they continued attempting to have said credit paid, although they HELD POSSESSION of the said bonds.

"(3) That the mortgage bonds of the Central Boca Chica were never alienated by the Central, which fact was known to the plaintiffs at the time of the filing of the complaint, as they were stockholders of Boca Chica.

"The establishment of these facts would have caused a different decision in the case, because the credit against Boca Chica having been paid to the plaintiffs, the latter would have lost all right to the bonds, even under the assumption that those bonds had been delivered as collateral security for said credit, as was claimed by witness Macías in his testimony.

"Subsequent to the trial, and in the manner and form stated in the affidavits of merit supporting this part of the motion, the defendants have discovered indubitable written evidence establishing the following facts:

"1. That the mortgage bonds claimed in the complaint were always the property of the Central Boca Chica, and that they were never alienated by the latter either in favor of the plaintiffs or of any other person.

"2. That the credit of $106,681.42 that was allotted to the plaintiffs against the Central Boca Chica was paid by the Central.

"3. That the plaintiffs never considered the allotment of the bonds as a payment of the credit, because subsequent to the execution of the deed of partition and allotment, they continued attempting to secure and did secure payment of the credit without ever considering the same paid by the allotment of the bonds.

"This new evidence is set forth in detail in the corresponding affidavits and of itself is sufficient to cause a result in this case entirely different from the decision rendered before the discovery of such evidence."

In arguing this point the defendants-appellants say in their brief:

"The first affidavit is that of Aureo B. García and establishes four points of the utmost importance, to wit:

556

"(a). That the bonds of the Central Boca Chica, including those claimed by the plaintiffs as belonging to them, were always the property of said Central, which never transferred them to any third person.

"(b). That the bonds of the Central Boca Chica which were in the possession of José D. Riera were used to secure agricultural credits contracted in favor of the Banco Comercial de Puerto Rico and of the Banco Territorial y Agrícola.

"(c) That the 400 bonds which were in the possession of José D. Riera at the time of his death had been delivered to him as security so that he should procure a loan of $200,000 from the Banco Territorial y Agrícola for the purpose of paying himself the $200,000 which the Central Boca Chica owed to him.

"(d) That at the time of the death of José D. Riera, the Central Boca Chica owed to him a sum which amounted to about $106,681.42.

"This affidavit and report was submitted to the public accountants, Stagg, Mather & Hough, whose report is also incorporated in the record; and it entirely confirms the affidavits of Arias and García.

"During the trial, the deed of partition and distribution of the estate of José D. Riera was presented in evidence; and in said document the above mentioned credit against the Central Boca Chica appears allotted to some of the heirs. The allotment necessarily referred to this credit and to no other, since the books showed that there only existed such credit at the time of the death of Mr. Riera. The plaintiffs themselves do not claim that any other credit existed against the Central Boca Chica than the one thus allotted.

"Now, the affidavit of Mr. García, confirmed by the report of Messrs. Stagg, Mather & Hough, and by the books of the company, copies of which have been presented with the motion according to law, by means of affidavits, shows that upon the death of Mr. Riera and after the allotment of the credit the business relations between Central Boca Chica and the heirs of Mr. Riera were not interrupted but continued the same as when Mr. Riera lived. In other words, the credit which was allotted was not a final liquidation but served only as a basis for the Heirs of Riera, plaintiffs in this case, to continue their dealings with the Central Boca Chica.

"There is no need to argue, regardless of the manner in which the deed of partition is drawn, that if the allotted credit was paid, the heirs of Riera had no interest, legal or equitable, in the mortgage bonds delivered to the Banco Territorial y Agrícola. That is perfectly obvious.

"But the affidavit of Mr. García, together with the evidence annexed thereto, shows that after the allotment the Succession of Riera received from the Central Boca Chica, on account of that credit, large sums of money.

"One of two things must be accepted: either the mortgage bonds were allotted in payment of the credit and had the effect of extinguishing the obligation, in which case the Central Boca Chica was not bound to satisfy such credit and these payments have no explanation whatsoever; or the allotment of the credit, with reference to the bonds, did not operate as a transfer to the Succession of Riera of the title to the bonds, and whatever the interest held by the Succession in those bonds, it was extinguished by virtue of the payment of the credit.

"But there is more; from the evidence discovered by the Banco Territorial y Agrícola subsequent to the filing of the supporting documents attached to the motion for a new trial, which evidence is set forth in a supplemental affidavit made by Mr. Coll Cuchí, one of the attorneys for the defendants, it appears that the defendant Olegario Riera paid to the Heirs of Riera the remaining portion of the credit, which appears as unpaid in the books of the Central Boca Chica; and that it was the said Antonio Macías who, in his capacity as attorney in fact of the Heirs of Riera, had signed the instrument acknowledging payment (carta de pago) wherein it was admitted that on that date there were no more obligations to be liquidated between defendant Olegario Riera and the plaintiffs."

The brief of the appellees in appeal No. 5038, relating to the application for a new trial, reveals one of the greatest efforts which we have seen made in cases of this kind. It contains 261 pages and every citation which appears in it has evidently been verified and connected with the facts involved in the instant case. There is not a single argument made by the appellants which has not been answered, explained, or refuted in all its aspects. It can well be said that the precedents relating to the manner in which a new trial should be sought, and the cases in which the same should be granted or denied, have been exhausted in said brief.

If the motion for a new trial were based solely on the first two grounds, we would be forced perhaps, technically,

to overrule the same, because the appellants, taking into consideration the allegations set forth in the complaint, should have gone to trial better prepared, it being very doubtful whether the testimony of Macías could be considered as such a surprise that ordinary prudence could not have guarded against, and because if due diligence had been exercised it is probable that they could have presented on time the newly-discovered evidence.

But the motion is also based on a third ground, the insufficiency of the evidence, which gives color, life, and force to the first two grounds in such a manner that in our opinion it is imperative to remand the case to the trial court so as to give the parties involved a new opportunity to clarify their respective positions, and to enable that court to conscientiously render the judgment that justice demands.

Even at the risk of unduly extending this opinion, we have incorporated in it all the evidence presented by the plaintiffs and have copied all the findings of fact made by the trial court. There is no doubt that the 400 bonds referred to were in the office of José D. Riera when he unexpectedly lost his life in an automobile accident. Nor is there any doubt that they were delivered to the Banco Territorial. The finding made by the district court as to the reason and purpose of such delivery was based solely on the testimony of Macías, a reading of which has indeed produced in us, in our minds, a feeling of uncertainty, of uneasiness, that prevents us from arriving at definite, firm, and clear conclusions. In order to give full credence to the testimony of Macías, the trial court had also to discard entirely the recitals incorporated by the bank, at the very moment when the bonds were delivered, in the receipt which was handed personally to Mr. Macías, a business man, attorney in fact of Riera while the latter lived and, upon his death, also of his widow, and representative of his Succession, whose large interests and varied business are evident from the record. Macías himself does not explain, notwithstanding his full

knowledge of the business affairs of Riera, how the latter became the owner of the bonds, and in several passages of his testimony he says that the bonds were given as security.

After a full reading and examination of plaintiffs' evidence, the judge as if by a natural impulse, asks for light, for more light, which will enable him to come to a decision. He does not feel convinced either that he should deny entirely the claim of the minor plaintiffs or that he should conclude that said minors were the owners of the 400 mortgage bonds referred to and that they were fraudulently deprived thereof by the defendant Olegario Riera, acting in concert with the other defendant, Banco Territorial y Agrícola de Puerto Rico. In this state of mind, the motion for a new trial to introduce new evidence of the character specified in the application and capable, if true, of changing totally or partially the judgment rendered, produces a feeling of rest and offers the true line of conduct to be followed, which is so clear and just, that the failure to adopt it implies that the trial judge did not properly exercise the discretionary power vested in him to reopen the case and order the holding of a new trial..

We will not stop to state the applicable law and jurisprudence. This Court, in many cases which are cited by both parties, has had occasion to delve into this question.

We would have made a more detailed analysis of the evidence had we not feared that by doing so, in emphasizing all the peculiar circumstances that we have observed, the case would be prejudged, when our decision does not go so far as to hold that the plaintiffs have no right to recover all or a part of what they claim; it being, on the contrary, limited to the granting of a new trial, which according to the statute consists in ''a reexamination of an issue of fact in the same court after a trial and decision by a court or referee.'' Section 220, Code of Civil Procedure. Nothing, therefore, which we may have been compelled to say regarding

the evidence should influence the mind of the judge of the District Court of San Juan before whom such new trial must be held. Upon the evidence to be introduced at the new trial, and only upon such evidence, should the new judgment to be rendered be based.

By virtue of all the foregoing, these appeals should be decided reversing the order of June 29, 1929; whereby the new trial was denied; granting a new trial, and therefore vacating the judgment of June 27, 1928; and remanding the case to the district court for further proceedings in accordance with the law.

Mr. Justice Texidor took no part in the decision of this case.